UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WILLIAM ZAMBRANA and
MARY LOU HUERTA,

    Defendants.
_____/

CASE NO. 1:09-CR-136

HON. ROBERT J. JONKER

## **OPINION and ORDER**

### Introduction

This matter is before the Court on Defendants' Joint Motion to Suppress (docket # 30) seeking suppression of approximately 27 ½ pounds of marijuana and a kilogram of cocaine found during the search of a house at 5981 Clear Stream Drive, SE in Kentwood, Michigan. The Court held an evidentiary hearing on the motion on August 31, 2009 (docket ## 32, 35, 37) and received supplemental briefing on the motion in September, 2009 (docket ## 38, 39). The Court has thoroughly reviewed the record and carefully considered the evidence. The motion is ready for decision.

### Undisputed Facts

On the night of August 31, 2008, around 11:00 p.m., two law enforcement officers knocked on the door of the residence at 5981 Clear Stream Drive, SE in Kentwood, Michigan. The officers, Detective Butler and Officer Paasch, were acting on information from an individual arrested earlier that day, who had stated that marijuana was being sold out of that residence. Detective Butler and

Officer Paasch were dressed in plainclothes, with no weapons visible. A team of back-up law enforcement officers waited nearby, down the street and out of view. Defendant Mary Lou Huerta and her seventeen year-old daughter, Samantha Taylor, were the only people in the residence when Detective Butler and Officer Paasch arrived. Ms. Huerta was spending the night at the residence, and she and Ms. Taylor were dressed for bed, in tank tops and pajama bottoms. Ms. Huerta's boyfriend, Defendant Zambrana, who lived at the residence, was in Florida with one or more of their children. Ms. Huerta answered the door, and the officers identified themselves and showed her their badges. The officers entered the house, and Detective Butler asked Ms. Huerta whether there were drugs in the house. Ms. Huerta responded that her boyfriend, Mr. Zambrana, kept a small bag of marijuana for his personal use. She retrieved the bag, which contained approximately one-half pound of marijuana, from the master bedroom and gave it to the officers.

At that point, the officers requested permission to search the house. They asked Ms. Huerta to sign a form granting consent to the search. She signed the form, but only after the officers agreed to note in writing on the form that they would leave once they had completed the search. Ms. Huerta told the officers Mr. Zambrana did not allow her in one bedroom in the house, but the consent form did not limit the scope of the search.

Once Ms. Huerta had signed the consent form, the back-up law enforcement officers came in to assist in conducting the search. During the course of the search, law enforcement officers found a kilogram of cocaine in the basement, and approximately twenty-seven pounds of marijuana in the bedroom Ms. Huerta had said she was not allowed to enter. The bedroom was normally occupied by Ms. Huerta's eight year-old son. Detective Butler sought and obtained a search warrant shortly after the illegal drugs were found. The officers found no other illegal drugs in the house.

## Disputed Facts

The principal factual disputes concern whether Ms. Huerta voluntarily consented to have Detective Butler and Officer Paasch enter the house, whether Ms. Huerta had actual or apparent authority to consent to the search, and whether Ms. Huerta voluntarily consented to the search. In particular, Ms. Huerta testified that she told the officers she did not live at the residence. According to Ms. Huerta, she tried to prevent the officers from entering, but they forced their way into the house despite her protests. She also claims that the officers coerced her to sign the consent form against her will. Detective Butler and Officer Paasch testified that although Ms. Huerta initially told them she did not live at the residence, soon thereafter she stated that she did live there. The officers also testified that Ms. Huerta willingly admitted them into the residence and was even cooperative in ushering them into and around the house. They also testified that she willingly signed the consent form, and even negotiated with them to insist that they write on the form that they would leave once the search was done.

The parties also dispute the scope of Ms. Huerta's consent to the search. Defendants claim that Ms. Huerta had no authority to consent to a search of Mr. Zambrana's home, and that her consent did not extend to her son's bedroom, in any event. The Government claims that Ms. Huerta had at least apparent authority to permit the search, as the lawful and only adult occupant at the time. Moreover, the Government claims Ms. Huerta had actual authority to consent because she in fact resided in the home with her boyfriend, Mr. Zambrana, and their children, and that at least one utility servicing the home was in her name. As for the scope of the search, the Government contends Ms. Huerta's actual and apparent authority extended to the entire premises, including her eight year-old son's bedroom, and that she gave the officers an unrestricted written consent to search the entire

premises. The Government notes that Ms. Taylor, Ms. Huerta's seventeen year-old daughter, testified that her mother had unrestricted access to the entire house, including the bedroom Ms. Huerta claimed she was not allowed to enter.

**Legal Standard**

The Fourth Amendment normally prohibits a search of a residence without a warrant. *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citing *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001)). An exception applies in situations in which officials have obtained voluntary consent to the search either from the individual whose property is searched or from a third party with common authority or apparent authority over the premises. *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Voluntary consent must be "unequivocal and intelligently given, untainted by duress or coercion." *United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990) (citing *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). Voluntariness is a question of fact to be decided based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). The consenting person's knowledge of a right to refuse is among the factors to be taken into account, but the prosecution need not demonstrate such knowledge to establish that consent is voluntary. *Id.* at 249. Consent is voluntary if, in light of all the circumstances, a reasonable person would have felt free to decline the request to consent. *United States v. Palomino*, 100 F.3d 446, 450-51. (6th Cir. 1996).

In determining whether Ms. Huerta had authority to consent, Sixth Circuit authority states that "[c]ommon authority is not to be implied from a mere property interest that a third person has in the property, but from 'mutual use...by persons generally having joint access or control for most purposes.'" *Gillis*, 358 F.3d at 390 (quoting *United States v. Matlock*, 415 U.S. 164, 172 n.7

(1974)). The government bears the burden of establishing that a third party has common authority. *Id.* (citing *Rodriguez*, 497 U.S. at 181). Further, even if a third party lacks actual common authority over the area searched, "the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search." *Id.* (citing *Rodriguez*, 497 U.S. at 188-89.) In determining apparent authority, courts apply an objective standard. *Id.* (citing *Rodriguez*, 497 U.S. at 188-89). "A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search." *Id.* at 390-91 (citing *Rodriguez*, 497 U.S. at 188-89.) The court must focus on the facts the officers understood at the time of the search. "When we inquire into whether there was apparent authority to validate third-party consent to a warrantless search, we look at the facts available to the police at the time the search began." *United States v. Morgan*, 435 F.3d 660, 664 (6th Cir. 2006).

**Analysis**

The Court is satisfied that Ms. Huerta actual and apparent authority to consent to a search of the entire residence and that her consent was voluntary at all critical points. The Court bases these conclusions on its careful observation of the witnesses at the evidentiary hearing, its analysis of the evidence received and on its credibility determinations on issues of disputed fact.

*Apparent and Actual Authority*

A law enforcement officer reasonably could conclude from the facts available that Ms. Huerta had authority to consent to the search. *See Gillis*, 358 F.3d at 390-391; *see Morgan*, 435 F.3d at 664. Ms. Huerta was spending the night at the residence with her seventeen-year-old daughter. She was dressed for bed. Her boyfriend, Mr. Zambrana, with whom she had two children, resided

at the house, though he was out of town that night. Ms. Huerta clearly knew her way around the house. She knew that Mr. Zambrana kept a personal cache of marijuana in the house, and she knew exactly where it was. Under these circumstances, it was reasonable to infer that Ms. Huerta had common authority over the premises. *See Gillis*, 358 F.3d at 390-391. Accordingly, the officers relied in good faith on Ms. Huerta's apparent authority to consent to the search. *Id.*

Indeed, it appears that Ms. Huerta had actual authority to consent to the search, and not merely apparent authority. Her daughter, Ms. Taylor, testified that Ms. Huerta had unrestricted access to the entire house, including without limitation the bedroom occupied by her eight year-old son. Officers found a utility bill for the premises addressed to Ms. Huerta and posted on the refrigerator. A series of officers testified that they observed Ms. Huerta at the premises on multiple occasions. This would only make common sense, because her longstanding boyfriend and father of at least some of her children lived there. So did her children. Ms. Huerta's attempts to claim she visited the home only occasionally and with little freedom are unpersuasive and not credible on this record.

Defendants' counsel point out that Ms. Huerta's driver's license address is at a location other than the home searched. This is true, but ultimately beside the point. People often maintain more than one residence. The address on a driver's license may well be one of those places, but it need not be the only place. Ms. Huerta testified that she typically spends weekends at the home the officers searched. She testified that her two children reside there. Ms. Huerta's daughter, Samantha Taylor, testified that her mother had unrestricted access to the house and all of its rooms, including the bedroom Ms. Huerta said she was not allowed to enter. On this record, the Court finds that Ms. Huerta had ready, free and unrestricted access to the house in question, including the bedroom in

6

which the twenty-seven pounds of marijuana were found, and that she had both the actual and apparent authority to authorize a search of the entire premises.

*Voluntary Consent at All Critical Points*

The officers' initial entry into the house is the first point at which the parties contest the voluntariness of consent. The best support for Defendants' argument that voluntary consent to entry was lacking is that Ms. Huerta initially told the officers that she did not live at the house and was not certain she could allow them to enter. But the Court finds as a matter of fact that she opened the door and allowed them to enter without protest. Moreover, Ms. Huerta never asked the officers to leave once they entered. All witnesses agree on this point. No matter what Ms. Huerta may have said about where she lived, she freely admitted the officers into the home, knowing they were officers of the law.

Once the officers were inside the house, Ms. Huerta within five minutes had provided them with half a pound of marijuana and negotiated and signed the consent to search form. Detective Butler, Officer Paasch and Ms. Huerta all testified that Ms. Huerta told the officers that her boyfriend, Mr. Zambrana, kept a small bag of marijuana on hand for his personal use. All agreed that Ms. Huerta then led Detective Butler to the master bedroom, retrieved the bag of marijuana and gave it to Detective Butler. There is no evidence of any coercion in this interaction. There is no evidence that the officers drew their weapons or exhibited or threatened any sort of physical control. Upon receiving the bag of marijuana from Ms. Huerta, the officers asked her to sign a form consenting to a search of the residence. Within only a minute or two, she negotiated a condition to the form and signed it. She had the officers agree in writing to leave the house once the search was

complete. Ms. Huerta testified that she would not have signed the form without that condition, which suggests that she felt free to decline the request for consent.

All of this – the entry into the house, the retrieval of the marijuana, and the negotiation and signing of the consent form – occurred within approximately five minutes after the two plainclothes law enforcement officers arrived at the residence. There is no testimony that there were any threats of force or arrest. Ms. Huerta describes the officers as being coercive by telling her that if she did not sign the consent form, they would wake up a judge to get a search warrant. But this statement is not inherently coercive; it merely provides truthful information about the options available to Ms. Huerta and to the officers at that point. Ms. Huerta could have declined to sign the consent form. Instead, she chose to proceed with the consent search, but only after insisting that the officers promise in writing to leave after completing the search. Ms. Huerta's fortitude and presence of mind to negotiate with the officers over this point belies any claim that the officers coerced her to sign the form against her will. On the contrary, Ms. Huerta concedes that when she signed the form, she knew she was giving her consent to a search of the house.

The Court does not credit Ms. Huerta's testimony that the officers forced their way into the house. She is the only person who so testified. Even her daughter, Samantha Taylor, did not testify to hearing or seeing a verbal or physical disruption at the door. Moreover, the immediate aftermath of the entry is not consistent with a forced entry. Within a period of five minutes, Ms. Huerta led an officer to one-half pound of marijuana she attributed to her boyfriend, negotiated a consent search form and then signed the form. A person experiencing the trauma and stress of a forced entry would be unlikely to cooperate in such a ready fashion or to have the poise to negotiate with the people who had just entered. The evidence is more consistent with the idea that Ms. Huerta was maneuvering

8

to appear cooperative in hopes of deflecting police interest away from her. In any event, the Court finds as a matter of fact that Ms. Huerta was not overwhelmed by the circumstances, that the officers did not forcibly enter the house, and that Ms. Huerta's consent to the officers' entry and her consent to the search were voluntary under all the circumstances.

*Scope of Consent*

The Court has already found that Ms. Huerta had both actual and apparent authority to consent to a search of the entire house, but the court will amplify its finding regarding the bedroom in which the officers found approximately twenty-seven pounds of marijuana. Nothing in the evidence suggests that Ms. Huerta directly limited the scope of her consent. Though Ms. Huerta required that the officers agree in writing to leave once the search was finished, she imposed no other conditions on her consent to the search. Nothing in the evidence suggests that Ms. Huerta directly forbade the officers from entering the bedroom. Even Ms. Huerta did not testify that she told the officers to stay out of the bedroom. The issue of the scope of her consent arises only because the parties agree that Ms. Huerta told the officers she did not have permission to enter the bedroom.[1]

The question becomes whether a reasonable officer under all the circumstances could conclude that Ms. Huerta had authority to consent to the search of the bedroom and if so, whether the consent was voluntary. *See Gillis*, 358 F.3d at 390-391; *see Morgan*, 435 F.3d at 664. The Court finds that a reasonable officer could so conclude. In the first place, it bears repeating that no one

---

[1]The Government attempts to invoke the inevitable discovery doctrine as a basis for denying the motion to suppress as it relates to the marijuana found in the bedroom, reasoning that the officers would have found the marijuana after obtaining the search warrant anyway. The inevitable discovery doctrine is unnecessary to the Court's analysis in this case. The Court notes, though, that the Sixth Circuit itself would probably not apply the doctrine on these facts. *See, e.g.*, *United States v. Quinney*, No. 07-4055, --- F.3d ---- , 2009 WL 3126177, *2-3 (6th Cir. Oct. 1, 2009) (probable cause to obtain a warrant does not justify warrantless search).

testified that Ms. Huerta limited her general consent to search in any way. She did not forbid entry into the bedroom. She merely said that she lacked permission to go in there on her own. This put the officers in the position of having to decide whether Ms. Huerta had actual or apparent authority to authorize an unlimited search, notwithstanding her statement about her own limited authority to enter the one bedroom. Ms. Huerta was the only adult in the house at 11:00 p.m. She was there with her daughter. No one else was at home or expected home that night. At least one electrical utility for the home was in Ms. Huerta's name, as the officers could see from its posting on the refrigerator. The officers had already seen that Ms. Huerta was comfortable and familiar enough in the house to walk them through to the master bedroom. Ms. Huerta led them to the bedroom she said she was not allowed to enter, which was normally occupied by her eight year-old son. A reasonable officer could conclude that Ms. Huerta had authority to consent to a search of the bedroom and granted that consent voluntarily. *See Gillis*, 358 F.3d at 390. Indeed, Ms. Taylor's testimony confirms that Ms. Huerta had unrestricted access to the bedroom.

## Conclusion

Under the totality of the circumstances, the law enforcement officers who searched the house could reasonably conclude that Ms. Huerta had authority to consent to the search. *See Gillis*, 358 F.3d at 390-391; *see Morgan*, 435 F.3d at 664. Indeed, she had actual as well as apparent authority. She consented to the search freely. *See Palomino*, 100 F.3d at 450-51. Accordingly, the search did not violate the Fourth Amendment. *Gillis*, 358 F.3d at 390. Defendants' Joint Motion to Suppress (docket # 30) is **DENIED**.

                                              /s/ Robert J. Jonker
                                              ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE

Dated: October 9, 2009